M. L. Collier Chairman Board of Trustees of Century Memorial Hospital Century
QUESTIONS:
1. Is the Board of Trustees of Century Memorial Hospital authorized by s. 155.11, F. S., to deposit hospital funds in, and transfer its operating accounts to, a bank located in Flomaton, Alabama?
2. Is the hospital authorized by law to discontinue its present emergency room service?
SUMMARY:
The Board of Trustees of Century Memorial Hospital is not authorized by law to designate an out-of-state bank as a depository for hospital funds or to deposit hospital funds in or transfer its operating accounts to an out-of-state bank. Neither Ch. 395, F. S., nor rules of the Department of Health and Rehabilitative Services require the maintenance of emergency room facilities as a condition to licensure under state law. Therefore, the board of trustees may discontinue emergency room service at the hospital provided that a procedure is maintained for handling the occasional emergency case, as required by Rule 10D-28.55(1)(n), F.A.C., and adequate and timely notice of the discontinuance of such emergency room service is given to the general public and the ambulance or emergency service organizations in the hospital's service area.
AS TO QUESTION 1:
Your first question is answered in the negative.
According to information supplied to this office by the Department of Health and Rehabilitative Services, Century Memorial Hospital is a county-owned hospital which has been licensed under the provisions of Ch. 395, F. S. Chapter 155, F. S., provides for the establishment and operation of county public hospitals. A public hospital operating under Ch. 155 is governed by a board of trustees whose members are appointed by the Governor. Section155.06, F. S. The chairman of the board is designated the `executive officer of the board of trustees' and is required to,inter alia, countersign all vouchers and warrants issued by the secretary and treasurer and give bond in a sum to be fixed by the board of county commissioners for the faithful performance of his or her duties in an authorized and reputable bonding company, s.155.07, F. S. Section 155.09, F. S., provides for the election of a secretary and treasurer whose duties include keeping a separate itemized account of all of the expenditures and disbursements of the board. The board is required under s. 155.12, F. S., to certify each year to the board of county commissioners `the amount necessary for the improvement and maintenance of such [county] public hospital' during the ensuing year; and the board of county commissioners `shall' at its annual meeting for the purpose of determining the amount of money or revenues to be raised for all county purposes, levy a sufficient tax to produce the sum required by the board of trustees' report to the county commission, subject to millage limitations imposed by law. Additionally, s. 155.24, F. S., states:
 In addition to the tax which may be levied under the provisions of this law, the board of county commissioners may allocate to the hospital funds any other public moneys in possession of said board of county commissioners, not otherwise appropriated or allocated to other uses.
As to the deposit of funds received by a county hospital, s.155.11(1), F. S., reads in relevant part:
 All moneys received for such hospital shall be deposied in any bank designated by the said board of trustees, and placed to the credit of the hospital fund and can be paid out only as bills for material supplies, equipment, wages, salaries, or other items of expense whatsoever shall have been audited by the secretary and treasurer and approved by a majority of the members of the board of trustees in regular session. (Emphasis supplied.)
The question then becomes whether the phrase `any bank designated by said board of trustees' authorizes the board to deposit hospital funds in an out-of-state bank. No question has been presented, hence no opinion is expressed, as to whether the board's authority under s. 155.011(2), F. S. (brought into the statutes by Ch. 78-406, Laws of Florida), if authorized in writing to do so by the payee, to `provide for the direct deposit of funds to the account of the payee in any financial institution which is designated in writing by the payee and which has lawful authority to accept such deposits' permits direct deposit of funds in out-of-state financial institutions.
Section 155.11(1), F. S., does not in express terms authorize the board to designate any bank as a depository of public moneys within or without the state. Cf. ss. 243.28, 660.10(8), F. S., and Nohrr v. Brevard County Educational Fac. Auth., 247 So.2d 304, 310
(Fla. 1971). Nor does it authorize the board to deposit public moneys in any bank that is not a lawfully designated and qualified depository of public moneys, or in any manner absolve the members of the board from personal liability for the loss of public moneys in their custody and under their control. Furthermore, the statute does not authorize the board of trustees of a county hospital to exercise any of its governmental or discretionary powers or perform any governmental duty or transact any official business outside the jurisdictional and territorial limits of the State of Florida. No such authority may be implied from the expressly granted power to designate `any bank' because the authority to deposit funds in an out-of-state bank is not necessary oressential to enable the board to carry out its statutory duties and powers. See State ex rel. Greenberg v. Florida State Board of Dentistry, 297 So.2d 628 (1 D.C.A. Fla., 1974), cert. dismissed,300 So.2d 900 (Fla. 1974); Gessner v. Del-Air Corporation,17 So.2d 522 (Fla. 1944), White v. Crandon, 156 So. 303 (Fla. 1934).
In AGO 075-283, this office considered the question of whether the Department of Banking and Finance was authorized by s. 659.24, F. S. (or any other statute), to designate or regulate out-of-state banks as depositories of public funds, so as to authorize or enable a municipality to deposit municipal funds in out-of-state depositories. Section 659.24(1), supra, specifies, inter alia, that
 [b]anks shall be depositories of public moneys under such regulations as may be prescribed by the department . . . . The department shall require banks so designated to give satisfactory security . . . for the sefekeeping and prompt payment of the public moneys deposited with them and for the faithful performance of their duties as financial agents of the state.
In addition, s. 659.24(3), F. S., provides, in pertinent part, for
 the safekeeping and prompt payment of moneys deposited, . . . whether such moneys so deposited be funds of, or under the control of, the state or any political subdivision thereof, . . . or of any district, commission, board, or body, whether corporate or otherwise, created by . . . any statute of the state, or of any officer [thereof] . . . .
After examining relevant case law, this office concluded in AGO 075-283 that the department was not authorized to designate or regulate out-of-state banks for the following reasons:
 The law is abundantly clear that the jurisdiction of the state is coextensive with the territorial boundaries of the state, and similarly the jurisdiction of state officers, agents, and departments is coextensive with the territorial boundaries of the state. The legislature has no power to enact a statute extending a state's power beyond its jurisdictional boundaries or to attempt to regulate persons, corporations or activities beyond its jurisdictional boundaries. . . . The [Department of Banking and Finance] would be without power beyond the territorial boundaries of the State of Florida to require banks to give satisfactory security by the deposit of bonds as required in the statute for the simple reason that the statute would be of no effect outside the state.
The principles set forth in AGO 075-283 apply with equal force to the officers of a county or any governmental entity established or created by statute. Clearly, the Legislature is not empowered to delegate to a statutory entity a power which the state itself does not possess. Therefore, s. 155.11(1), F. S., does not authorize the board of trustees of a county hospital to transfer the hospital operating funds to a bank which is outside the state. Cf. AGO 078-68, stating in pertinent part that no statutory authority had been found for the deposit of community college funds
 . . . in a foreign bank, an out-of-state bank or any bank not properly established as a depository under the laws of Florida or the foregoing rules of the state board [of education].
Moreover, in light of the extensive responsibilities of the board of trustees with respect to the administration, control, and custody of public funds (see ss. 155.07, 155.11, 155.12, 155.21, and 155.24, F. S.), it is important to consider established principles relating to the liability of public officers for public funds paid into their custody. Under the general rule, in the absence of a statute to the contrary, a public officer is liable as an insurer of public funds in his custody. 67 C.J.S. Officers
s. 119(a); Thomas v. Carlton, 143 So. 780 (Fla. 1932). In other words, unless otherwise provided by law, such an officer is personally liable for `loss resulting from theft, robbery, fire or the failure of his depository . . . .' 67 C.J.S. Officers s. 119(a); 15 McQuillin Municipal Corporations s. 39.47(a), n. 6, p. 143. Cf. Spencer v. Mero, 52 So.2d 679, 680 (Fla. 1951), in which the court indicated that unless a public officer was a voluntary trustee who held public funds in trust, he was liable for the loss of the funds by theft.
However, the Legislature is authorized to enact statutes absolving a public officer from liability for the loss of public moneys. Mordt v. Robinson, 156 So. 535 (Fla. 1934). In Mordt, the court ruled that a statute (C.G.L. 1927 s. 6079, the forerunner of present s. 659.24, F. S.) which authorized certain officers to deposit funds in banks designated as official public depositories of public moneys, operated to absolve officers, who in good faith deposited funds in such depositories, from liability for the loss of public funds caused by the insolvency and closing of the depository. The relevance of this case to your inquiry is readily apparent. If the members of the hospital board of trustees elect to deposit hospital funds in, and transfer its operating accounts to, a bank which is not a qualified depository of public moneys under s. 659.24, F. S., they do so at the risk of personal liability for loss of the funds.
AS TO QUESTION 2:
Chapter 395, F. S., which provides standards for licensing of hospitals, does not require a hospital to establish or maintain an emergency room as a condition to licensure. Further, Rule 10D-28.55, F.A.C., promulgated by the Department of Health and Rehabilitative Services, provides in pertinent part as follows:
 For purposes of these rules, all institutions within provisions of Chapter 395, F. S., shall be classified as either general or a special hospital.
 (1) General Hospitals — the following characteristics shall identify a general hospital:
 (n) An organized emergency service or department is not required; however, there must be at least a procedure for taking care of the occasional emergency case. (Emphasis supplied.)
I have been informed by the Department of Health and Rehabilitative Services that Century Memorial Hospital is classified as a `general' hospital. Accordingly, the department advises that such a hospital may discontinue its emergency room service, provided that it retains written internal procedure for handling the occasional emergency case as required by Rule 10D-28.55, (1)(n), supra.
My research has disclosed no cases which have considered whether a hospital is prohibited, as a matter of public policy, from discontinuing or significantly lessening the emergency services offered to the public, in the absence of a statutory duty to maintain such facilities. However, in at least one case, the court indicated that a public hospital may owe the public a higher duty of care with respect to emergency treatment than a private hospital. See Williams v. Hospital Authority of Hall County,168 S.E.2d 336 (Ga.Ct.App. 1969), in which the court stated:
 No hospital, public or private, is under a common-law duty to accept everyone who applies for admission; nor is there a duty to maintain an emergency ward. However, this is not the same as the duty owed by a public hospital supported by public tax funds which does maintain emergency facilities for the benefit of the general public. The maintenance of such emergency facilities by a public hospital to render first aid to injured persons has become a well-established adjunct to the main business of a hospital. . . . To say that a public institution which has assumed this duty and held itself out as giving such aid can arbitrarily refuse to give emergency treatment to a member of the public . . . is repugnant to our entire system of government.
The Hall case specifically involved a public hospital's arbitrary refusal to treat a particular person in its emergency room. However, the court also recognized that while the hospital was under no duty to maintain an emergency ward in the first place, a public hospital that did maintain emergency room service for the benefit of the general public and held itself out as giving such emergency aid, could not refuse to give emergency treatment to a member of the upblic. In effect, the court reasoned that under such circumstances the public is entitled to rely on and expect such service, when it is available. See also, Mercy Medical Center of Oshkosh, Inc. v. Winnebago County, 206 N.W.2d 198, 200-201
(Wis. 1973).
Accordingly, I concur in the advice and recommendations of the Department of Health and Rehabilitative Services with to the discontinuance of emergency room service, namely, that the hospital board of trustees give adequate and timely notice of its intent to discontinue the existing emergency room service to the residents and members of the general public in hospital's service area as well as to all ambulance or emergency service organizations (public and private) before discontinuing such emergency room services. Further, I would suggest that the Department of Health and Rehabilitative Services be consulted as to the minimum standards to be observed in the emergency procedure contemplated by Rule 10D-28.55(1)(n), F.A.C.
Prepared by: Patricia R. Gleason, Assistant Attorney General